IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

MONICA ANDERSEN                                                                                PLAINTIFF

v.                                              No. 4:05CV00118 GH

MAIL CONTRACTORS OF AMERICA                                                       DEFENDANT

### ORDER

Plaintiff filed a pro se complaint on February 1st alleging that her termination violated Title VII. Her counsel filed an amended complaint on July 8th eliminating Title VII as a basis, but claiming violations during the Americans with Disabilities Act ("ADA"), the Arkansas Civil Rights Act ("ACRA"), and the state's public policy due to her disability.

On August 15th, defendant filed a motion for summary judgment supported by brief, exhibits and a separate statement of undisputed facts. It contends that plaintiff cannot establish a prima facie case of disability as she is not disabled within the meaning of the ADA, she is not qualified to perform the essential functions of her job – attendance, and she could not be reasonably accommodated. Defendant further asserts that plaintiff was terminated for a legitimate, nondiscriminatory reason – excessive absenteeism – and she cannot show that the reasons for her termination are pretextual. It also argues that her termination was not a violation of the ACRA as defendant is not required to reasonably accommodate her and she could not be reasonably accommodated. Defendant finally states that her termination is not a violation of any public policy.

Plaintiff responded on September 12th that she has coronary heart disease; had a heart attack on January 3, 2003; underwent triple bypass surgery on January 6th; was allowed to take FMLA leave after she used up her entitlement to vacation days and personal time-off; on April 2nd, defendant sent her a letter stating that her FMLA eligibility has expired and she returned to work with the understanding that any further leave would be classified as general leave rather than FMLA, vacation time or personal time; she missed time from work in May, June, July, and August; on September 25th she was called into a meeting with her supervisor and Human Resources Director and informed that if she did not provide a guarantee from her doctor that she would not miss anymore work due to her disability she would not be accommodate and be terminated; and she suffered a heart attack on her way to work on September 26th and when she called to report that she would return to work on October 3rd, she was advised that she had been terminated.

She asserts that there are material disputes regarding whether she is a disabled individual, whether she could perform her job with or without reasonable accommodation, whether she sought accommodation from defendant, whether defendant made a good faith attempt to accommodate her, whether the stated reason for terminating her was pretextual, and whether she was fired because of her disability.

Plaintiff states that her major life activities of walking and breathing are substantially limited. She points to her small raise and "Very Good" personal appraisal in June and while noting her few days off in June, July and August, that she did not miss any work days between July 18th and the September 25th meeting. Plaintiff acknowledges that regular and predictable attendance is an essential function of the job, but she followed defendant's policies, attended work on a regular and predicable basis, called in as soon as she was aware of any need to miss work and did not miss work

in a sporadic fashion despite her very serious health condition and the treatment she was undergoing. She argues that her disability could have been accommodated by a general leave of absence, but she was terminated before she could request such accommodation; that her absence after the September 26th heart attack was not indefinite as she was released to return on October 2nd; and she suffered adverse employment actions in being requested to guarantee that she would not miss any more days and the termination.

Defendant filed a reply on September 20th emphasizing that plaintiff could not perform the essential functions of her job because of her attendance problems and reviews that from April 7th until her September 30th discharge, she missed 21.5 days of work as reflected in the time cards: April 24th; May 15th; June 20th; June 24th – June 27th; June 30th; July 1st – 3rd; July 14th – July 18th; ½ days on August 14th, August 17th and September 5th; September 18th – 19th; September 26th and September 30th so overall she had missed 88.5 days of work from January 1st until September 30th or approximately 47% of the total workdays.  It continues that while employers are required to reasonably accommodate the disability even if the employee has a problem with attendance, but not if the accommodation would impose an undue hardship on the employer and employers are not required to grant an indefinite leave of absence.  Defendant points to plaintiff's deposition testimony that she could not give defendant any notice of her need to be off work or when she would be able to return; defendant's position of not knowing when plaintiff would be absent and having to reallocate work at the last minute; and allowing plaintiff to unexpectedly call-in and announce she was going to be absent would require defendant to have another employee available at all time to complete her work.

Summary judgment can properly be entered when there are no genuine material facts that can be resolved by a finder of fact; that is, there are no facts which could reasonably be resolved in favor of either party. The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2512 (1986). The non-moving party may not just rest upon his or her pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 106 S.Ct. 2548 (1986); Civil Procedure Rule 56. "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather the dispute must be outcome determinative under prevailing law." Holloway v. Pigman, 884 F.2d 365, 366 (8th Cir. 1989).

Local Rule 56.1 provides that a party moving for summary judgment must file a separate, short and concise statement of material facts as to which it contends there is no genuine issue to be tried. The rule further provides that unless the non-moving party files a separate, short and concise statement of the material facts as to which it contends a genuine issue exists to be tried, all material facts set forth in the moving party's statement will be deemed admitted.

Defendant's Local Rule 56.1 statement is set out below with plaintiff's response following in brackets:

1. Plaintiff was hired by Defendant on March 13, 1995. She was hired as a Compliance Assistant in the Safety Department. [Admit.]

2. On April 16, 2001, Plaintiff was transferred to the position of Specialist in the Accounts Payable Department. [Admit.]

3. Plaintiff requested FMLA leave for scheduled surgery to begin on January 6, 2003. [Admit.]

4.  Upon commencement of Plaintiff's leave, Defendant sent her a letter explaining her rights under the FMLA. Attached to this letter was a document entitled "Certificate of Health Care Provider" which, as Defendant explained in its letter, was to be completed by Plaintiff's health care provider to certify her serious health condition. Defendant's letter requested that she return this form by January 21, 2003. [Admit.]

5.  Plaintiff did not provide the requested certification by January 21, 2003. [Deny. Plaintiff states that her doctor provided the requested information to Defendant.]

6.  On April 2, 2003, Defendant sent Plaintiff a reminder of her obligation to provide a certification of her serious health condition. The letter further stated that, if she did not provide the requested certification by April 7, 2003, her leave would no longer be eligible for COBRA continuation coverage. [Admit.]

7.  Plaintiff did not provide the requested certification by April 7, 2003. [Deny. Plaintiff states that her doctor provided the requested information to Defendant.]

8.  Plaintiff's twelve-week entitlement to FMLA leave expired on March 31, 2003. On April 2, 2003, Defendant sent Plaintiff another letter explaining that her FMLA eligibility had expired. Because Plaintiff needed more time off because of her condition, this letter explained that any extra time off would be considered a general leave of absence. It further explained that, because her leave was related to her own serious health condition, she would be required to present a fitness-for-duty certificate prior to being restored to employment. [Deny. Plaintiff states that Defendant required her to use up her vacation and personal days before FMLA entitlement begin.]

9. Plaintiff returned to work on April 7, 2003. Upon her return, she provided a doctor's release to return to work on that date. [Admit.]

10. Plaintiff never provided a certification of her serious health condition for purposes of her FMLA leave. [Deny. Plaintiff states that her doctor provided the requested information to Defendant.]

11. Upon her return, Plaintiff exhausted her vacation eligibility by making repeated unscheduled call-ins. [Deny. Plaintiff states that Defendant required her to use up all her vacation time before she went on FMLA leave. Therefore, she had no vacation eligibility upon her return from FMLA leave. Plaintiff states that Defendant refused to accommodate her with a "general lave of absence" as offered in the April 2, 2003 letter. Plaintiff also states that as her medical condition and need for accommodation was known to Defendant, her absences cannot be characterized as "repeated, un-scheduled call-ins."]

12. Plaintiff also exhausted her eligibility for personal time off by making repeated unscheduled call-ins. [Deny. Plaintiff states that Defendant required her to use up all her personal time before she went on FMLA leave. Therefore, she had no personal time eligibility upon her return from FMLA leave. Plaintiff states that Defendant refused to accommodate her with a "general leave of absence" as offered in the April 2, 2003 letter. Plaintiff also states that as her disability and need for accommodation was known to Defendants, her absences cannot be characterized as "repeated, un-scheduled call-ins."]

13. Beyond her vacation time and personal time off, Plaintiff continued to miss work through repeated unscheduled call-ins. [Deny. Plaintiff continued to request accommodation for her disability.]

14. From Plaintiff's return from her FMLA leave and general leave of absence on April 17, 2003, until her discharge on September 30, 2003, Plaintiff missed work on 21.5 days due to unscheduled call-ins. [Deny. Plaintiff requested accommodation due to her disability.]

15. From January 1, 2003, until her discharge on September 30, 2003, Plaintiff missed 88.5 days of work. [Admit.]

16. After Plaintiff returned to work from her FMLA leave and general leave of absence on April 7, 2003, Defendant noticed that her work performance declined. [Deny. Plaintiff states that her work performance did not decline.]

17. Plaintiff's supervisor, Donna Thomas, talked to her regarding her performance problems. [Admit.]

18. On September 8, 2003, Donna Thomas verbally counseled Plaintiff regarding her performance issues, and documented their conversation. Plaintiff was counseled regarding holding checks for too long or sending checks out without backups, and for not matching checks to the proper invoices; for not paying attention to detail, including paying wrong amount, paying the correct vendors, marking account codes on the invoices, and seeking approval before sending out checks; and for her lack of organization, such as filing. [Admit.]

19. On September 25, 2003, Plaintiff's supervisor, Donna Thomas, along with the Human Resources Director, Kathy Bradley, met with Plaintiff concerning her repeated unscheduled absences. Plaintiff was reminded that attendance was an essential function of her job and that her excessive unscheduled absences were impairing her duties. Ms. Bradley asked Plaintiff if there was any information she could provide Defendant to help it accommodate

her. Plaintiff responded that nothing could be done to accommodate her condition. Plaintiff was advised that she could not continue making unscheduled call-ins. [Admit. Plaintiff states that during this meeting Defendant told Plaintiff she had to provide them a "guarantee" from her doctor that she would not miss any more days due to her disability. Plaintiff informed defendants that due to the nature of her condition, neither she nor her doctor could provide such a guarantee. Plaintiff states that Defendant informed her that if she did not provide the "guarantee" her absences would no longer be accommodated and she would be terminated if she called in sick again.]

20. Plaintiff knew that attendance was an essential function of the job. [Admit. Plaintiff knew that Defendant would terminate her if she called in sick due to her disability.]

21. Plaintiff never requested a general leave of absence or any other accommodation after her return to work on April 7, 2003. [Deny. Plaintiff requested the offered accommodation of a "general leave of absence."]

22. Plaintiff incurred additional unscheduled absences on September 26, 29, and 30, 2003. [Admit. On September 26, 2003 Plaintiff suffered a heart attack on her way to work. Plaintiff states that she felt poorly when she woke up that morning, but attempted to report for work as she was afraid she would be terminated.]

23. Plaintiff was terminated on September 30, 2003. Defendant cited excessive absenteeism as the official reason. [Admit.]

The Court finds that the following excerpts from plaintiff's June 15th deposition are relevant in resolving this motion:

Q. Okay. Have you worked anywhere since your employment with Mail Contractors?

A. No.

Q. Have you applied with anyone since your employment with Mail Contractors?

A. No.

Q. Have you looked for a job since your employment with Mail Contractors?

A. No.

Q. Is there a reason you haven't looked for a job since your employment with Mail Contractors?

A. Due to heart problems.

Q. So you don't think you could work anywhere else?

A. There's a good possibility, but right now I'm under a doctor's care. [Page 18, line 19 though page 19 line 8.]

****

Q. But you did understand that attendance was an essential function of your job?

A. Yes.

Q. Okay. And at the meeting of the 25th of September, did you not tell Mail Contractors that you couldn't predict when you would need to miss work?

A. When you have this kind of problem, you don't know when it will hit. And every time I missed, I was in the hospital.

Q. But you couldn't predict when you would be off?

A. No.

Q. Did you tell them that you were unable to give them notice of when you would need off?

A. It was never asked.

Q. Could you give them any notice of when you would need off?

A. No.

Q. When you did needed to be off, could you tell Mail Contractors when you would be able to return?

A. No.

Q. How often did your heart condition require you to miss work?

A. It depends on what I had to do. If I had to have a stint, it was three days. If I had a heart attack, it was four days. I can't guarantee how long I will be off.

Q. So you couldn't predict how long or how often you needed off?

A. No.

Q. Do you know how many days you missed overall from work in 2004 [sic] because of your condition?

A. They stated I missed 21 days.

Q. Is it your understanding that it was 21 days after you took 12 weeks of FMLA leave?

A. I don't know. They just said I missed 21 days.

Q. Did you take 12 weeks of FMLA beginning in January?

A. Short-term disability leave, yes.

Q. And so that three months was more than 21 days; isn't that correct?

A. Yes.

Q. So if you missed 21 days, it was likely after you took your FMLA leave?

A. A good possibility.

Q. Was every absence that you needed due to your heart condition?

A. Yes.

Q. You never took a personal day off?

A. Every day I took off, I was in the hospital. I was admitted through the ER in the hospital.

Q. There was never a day you just took off and stayed at home?

A. There may have been one day when I had a cold, but the other times is with my heart.

Q. And, again, it was always of McNee or Linderman, to that –

A. Yes.

Q. Do you know what happened to your work assignments when you missed those days?

A. Someone else had to do my job.

Q. Was there any time that your job was just unfilled until your return?

A. I wasn't aware of it.

Q. Do you know who did fulfill your job duties?

A. No.

Q. Were you aware of whether or not this created a burden on them to complete their job duties at the same time?

A. No.

Q. You know that., as a general policy, Mail Contractors allows general leaves of absence for medical conditions, don't you?

A. All I was leaved of, it was my short-term disability. I was not aware of any other leave. It was not told to me of any other leave.

Q. Were you ever asked whether you needed to take time off because of your condition until you could come back to work full-time?

A. No.

Q. Donna Thomas never asked you if you needed to take time off because of your condition until you could come back to work full-time?

A. No.

Q. So if she said that such a leave was offered to you, she would be lying?

A. There was no other leave offered to me.

Q. Ever?

A. Ever. Just the short-term disability.

Q. They never mentioned casually and asked you whether you needed to take some time off?

A. No.

Q. Do you know how the days were classified that you missed when you were taking these days off?

A. How were they classified?

Q. Yeah. Were they classified as general leaves of absence, or sick days, or –

A. I guess they were considered sick days. I don't know.

Q. Do you know how many sick days you were allowed under the Mail Contractors' policy?

A. We had four personal days. But the time I was off from January to April, my vacation time and my sick days was cut because I was not working during that time.

Q. So the 21 days you missed after that couldn't have been classified as sick days.

A. I used some of my vacation time that I had left to use it.

Q. And after you used all of that, do you know how the remaining days were classified?

A. No.

Q. Could they have been classified as general leaves of absence?

A. No.

Q. And why not?

A. I don't know.

Q. How would they have been classified?

A. I guess sick days.

Q. Do you know of other employees who have taken a general leave of absence from Mail Contractors?

A. I'm not sure. I know there was one who had – she had surgery on her brain, but I didn't discuss whether it was a general leave or whatever.

Q. How long was she off?

A. I don't know.

Q. Did she take one absence for an extended period of time, or did she need to take –

A. I don't know.

Q. — days off here and there?

A. I don't know.

Q. What was the employee's name?

A. Angela Jones.

Q. Do you know whether any other employee has needed days off like you have, just a leave of absence of three days here and four days there?

A. I don't know.

Q. And again, Donna Thomas never asked you whether you just needed to take some time off until you could come back to work full-time?

A. No.

Q. And you never stated that you couldn't do that because you needed the money?

A. No.

Q. Do you think if you needed to take three or four months off until you could come back to work full-time that you could have had it?

A. If it was offered to me, yes.

Q. Did you ever ask for it?

A. No.

Q. Did you think you could have asked for it?

A. I didn't know what I could ask.

Q. So you just didn't?

A. No.

Q. Other than the leaves of absence, was there any other way Mail Contractors could have accommodated your condition?

A. They never stated what they could do for me. I never stated what they could do. I didn't know I was going to have this kind of problem.

Q. Looking back on it now, do you think there is anything else they could have done?

A. If they'd have offered me a part-time, work so many hours a day, or if they could've gave me a general leave for a couple of months to get straightened out, yes. But they didn't.

Q. And you never asked for either one of these?

A. No.

Q. Did you know whether a part-time position was available?

A. No.

Q. You don't know or there wasn't a part-time position available?

A. At the time, I didn't know.

Q. So you never made a request for either of those?

A. No.

Q, In your opinion, why were you terminated?

A. In my opinion, why was I terminated?

Q. (Nods head up and down.)

A. I felt like that due to my disability, that they thought I couldn't require to be there or perform my jobs. I didn't bring this on myself.

Q. So you think that your absences were part of the reason for your termination?

A. No. I didn't want to be off; I didn't want to have a heart attack; I didn't want to have stints. It happened.

Q. But you think that's a reason why they terminated you?

A. Yes. [Page 35, line 15 – page 42, line 21.]

****

Q. Okay. You said you're not working now. What do you do now during your day? Do you have any hobbies?

A. Cross-stitch.

Q. When do you think – you said that you anticipate being able to go back to work sometime. Do you know when?

A. No.

Q.   Has anyone told you that you might be able to go back to work or are you just hoping?

A.   No.  [Page 51, lines 4-12.]

The Court also has considered the affidavits of Donna Thomas, Kathleen Bradley, and Janice Hull.  Although there are portions of their statements that conflict with plaintiff's deposition testimony, the Court notes that the portions relating that plaintiff's unscheduled absences created an undue hardship on the Accounts Payable Department since there were only three remaining employees to fulfill the responsibilities of the department and Thomas had to work a significant amount of overtime in order to make sure that plaintiff's most essential duties such as payment deadlines were completed are uncontroverted.

Recently, the Eighth Circuit Court of Appeals in Bass v. SBC Communications, Inc., 418 F.3d 870, 873 (8th Cir. 2005), set out the framework for ADA claims as follows:

> "In the absence of evidence of direct discrimination, ADA claims are evaluated by the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1044 (8th Cir. 2005).  Under this framework, an employee must first establish a prima facie case of discrimination: (1) an ADA-qualifying disability; (2) qualifications to perform the essential functions of his position with or without a reasonable accommodation; and (3) an adverse action due to his disability.  Kincaid v. City of Omaha, 378 F.3d 799, 804 (8th Cir. 2004). Once the employee establishes a prima facie case, the employer must proffer a legitimate, nondiscriminatory reason for the adverse employment action.  See McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817.  If the employer proffers such a reason, the employee must respond and show that the proffered reason is merely a pretext for discrimination.  See id. at 803, 93 S.Ct. 1817.
>
> The district court determined that Bass failed to establish a prima facie case, as he could not perform the essential functions of his job.  An employee is qualified for a job when (1) he meets the necessary prerequisites for the job, including training, education, and experience; and (2) can perform the essential functions, with or without reasonable accommodation. Cravens v. Blue Cross and Blue Shield of Kansas City, 214 F.3d 1011, 1016 (8th Cir.2000). It is undisputed that Bass met the necessary prerequisites for his job.  The only issue is whether Bass could perform the essential functions of his job with or without reasonable accommodation.

In addition, as cited by defendant, Epps v. City of Pine Lawn, 353 F.3d 588, 593 FN5 (8th Cir. 2003) states :

> In addition, Epps failed to establish that he was qualified to perform the essential functions of the job, with or without accommodations. His excessive absenteeism from work rendered him unable to perform the job, and time off of work was not a reasonable accommodation in this instance. Attendance at work is a necessary job function. Nesser, 160 F.3d at 445. "An employee who is 'unable to come to work on a regular basis [is] unable to satisfy any of the functions of the job in question, much less the essential ones.' " Id. (quoting Moore v. Payless Shoe Source, Inc., 139 F.3d 1210, 1213 (8th Cir. 1998)). Even though attendance is an essential function of the job, the ADA requires employers to reasonably accommodate the disability, unless the accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A). The employee must show that a reasonable accommodation was available. Nesser, 160 F.3d at 446. Epps, however, failed to show that a reasonable accommodation existed. Epps asserts that the six-month leave of absence was reasonable; however, Pine Lawn, a small municipality, could not reallocate Epps's job duties among its small staff of fifteen to twenty-two police officers. An employer is not required to hire additional people or assign tasks to other employees to reallocate essential functions that an employee must perform. Hatchett v. Philander Smith Coll., 251 F.3d 670, 675 (8th Cir. 2001).

See also, 38 Creighton L. Rev. 871, 886-888.

Even if the Court were to consider that plaintiff was disabled within the meaning of the ADA, she has failed to establish that she was qualified to perform the essential functions of the job, i.e., attendance, with or without accommodation. The record establishes that she missed 21 days of work after her return from leave on April 7th, that these absences were unpredictable and of varying length, and that they caused an undue hardship on defendant resulting in additional work for the other employees in her department and overtime payments incurred to assure that deadlines were met.[1]

---

[1] While it is clear from plaintiff's deposition testimony that she was making the effort to be present at her job and sincerely wanted to continue in her position, it is also apparent that her health condition continued to require random absences from defendant's workplace and has resulted in her not working or even looking for work since her termination.

Moreover, even if the Court were to assume that plaintiff had made a prima case, defendant has clearly provided a legitimate, nondiscriminatory reason for its action – the need for regular attendance by plaintiff.

Plaintiff has not countered this non-discriminatory and non-retaliatory reason by showing, through administrative inconsistencies or comparator employees, that defendant's policy on absences was not applied on a uniform basis.  Thus, she has failed to show that defendant's reason – absenteeism – for her termination was pretextual and so defendant is entitled to summary judgment on the ADA claim.  As plaintiff has stated that claims under the ACRA are analyzed using the same principles as ADA claims, her claims under the ACRA and public policy also fail.

Accordingly, defendant's August 15th motion (#15) for summary judgment is granted thereby mooting its September 21st supplemental motion (#39) for summary judgment.

IT IS SO ORDERED this 3rd day of October, 2005.

_____
UNITED STATES DISTRICT JUDGE